WILLIAM L. OSTERHOUDT (SBN 043021)
Law Offices of William Osterhoudt
135 Belvedere Street
San Francisco, California 94117
Telephone: (415) 664-4600
Email: osterhoudt@aol.com

K. ALEXANDRA McCLURE (SBN 189679)
214 Duboce Avenue
San Francisco, California 94103
Telephone: (415) 814-3397
Email: alex@alexmcclurelaw.com

Attorneys for Defendant
ADAM THATCHER LAWRENCE

UNITED STATE DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>vs. )<br>)<br>ADAM THATCHER LAWRENCE, )<br>)<br>Defendant. )<br>)<br>)<br>)<br>) | **Case No. 18-00014 HSG**<br><br>**DEFENDANT ADAM LAWRENCE'S SENTENCING MEMORANDUM** |

**INTRODUCTION**

    Adam Lawrence comes before the court for sentencing on June 25, 2018. Mr. Lawrence has pled guilty to mislabeling wildlife intended for importation in violation of 16 U.S.C. §§ 3372(d) and 3373(d)(3). He has never before been charged with or convicted of any crime and has established himself as a credit to his Mendocino County community and his family. Mr. Lawrence pled guilty pursuant to a plea agreement under which the Government agreed to

recommend that he be sentenced to probation. A Presentence Report prepared by the U.S. Probation Office concurs in this recommendation, recommending that Mr. Lawrence be placed on probation for three years and that he perform a period of community service as directed by the Probation Officer. The Probation Officer has recommended that Mr. Lawrence pay a fine in the amount of $10,000 to the U.S. Fish and Wildlife Service. It is also recommended that Mr. Lawrence be prohibited from hunting, trapping, or acting as a hunting guide or scout as a condition of his probation.

Because Mr. Lawrence has never before been in trouble with the law, has fully accepted responsibility for his actions in this case, and has expressed genuine remorse for those actions, and because of his outstanding record of achievement in his community and his clear devotion to his family, we respectfully urge that the court adopt these recommendations and sentence Mr. Lawrence to probation under appropriate conditions.

## ADAM LAWRENCE

Mr. Lawrence, a native of Mendocino County, is 38 years old and lives with his wife and two young daughters in Willits, California. For many years Mr. Lawrence has been involved in commercial fishing, which is addressed by the letter of Joshua Allman in Exhibit A, which includes a number of character reference letters and a letter from the South African rancher on whose land Mr. Lawrence shot a leopard that had been preying on livestock. Mr. Allman, who has known Adam his entire life and looks upon him as a mentor, describes the fishing environment and the devotion of fishermen, like Adam, to sustainable and environmentally sound fishing. When growing up, Adam was actively involved in the farming community, belonging to an organization called Future Farmers of America, in which he raised pigs and cows. Adam has always been close to nature and the land. As he grew older, Adam

became involved in real estate and earned the respect of many persons throughout the community, honesty and integrity. Jeremiah Johnson, a licensed building contractor on the Mendocino Coast, met Adam through mutual friends in the commercial fishing industry in Fort Bragg, California, and has maintained a friendship with him ever since. Mr. Johnson writes:

> "Adam is one of the most genuine human beings I have ever met. He is a loving father to his two beautiful little girls, as well as a loving husband to his wife. Ever since I've known Adam, he has always worked multiple jobs as a fisherman and a real estate agent, always trying to provide the best possible life for his family. He is the kind of guy you don't meet very often, especially nowadays. He is respectful, hard-working, and good natured person, who genuinely cares about others."

Bryce Noel, who has known Adam since 2007, writes that he has looked up to Adam "as an excellent role model … an amazing husband, and an even more amazing father." Mr. Noel considers himself lucky to have "such a wonderful connection with that family." David Oncale, who served fifteen years as a California highway patrol officer, notes that Adam has been "a big help to local law enforcement in the marijuana and environmental crimes that occur." Mr. Oncale relates that Adam "stood forth when no one else could, for an elderly man at the coast, and basically gave him the end times of his life."

Most of these letters were originally addressed to the prosecutor before this case was finally resolved through Mr. Lawrence's guilty plea to the Lacey Act violation. But the sentiments they express are equally applicable in the present context. These are people who know about this case and know that Mr. Lawrence was wrong in violating the law as he did, but still they have no doubt about the essential worth of their friend and neighbor. Tom Allman, the sheriff of Mendocino County, has written a letter attesting to the fine character of Adam Lawrence, whom he knows well, and has observed for a number of years.

---

3

Bruce Smith, who is chief investigator for the Lake County District Attorney's office relates that prior to retirement, he served for 32 years with the Mendocino County sheriff's office, where he was a sergeant in charge of marijuana eradication. Mr. Smith relates that he has known Adam Lawrence for over ten years and thinks very highly of him. He knows Adam to be a great family man, honest, hardworking and a true sportsman. Mr. Smith writes:

> "I have had the opportunity to hunt with Adam on numerous occasions and have found that he is a conservationist who loves the outdoors."

Mr. Smith, like other writers, realizes that the leopard Adam killed in South Africa should not have been imported into the United States under false pretenses and realizes that Adam made a mistake, but also recognizes that Adam did not do this for financial gain. It was really one grave error in the course of an exceedingly well lived life. In the same vein, James Nerli, Jr., an attorney and former army intelligence officer, writes that he met Adam while he was acting as a prosecutor and immediately became friends with Adam, sharing a passion for the outdoors and hunting. Like Mr. Smith, Mr. Nerli writes that:

> "Adam is a man who made a bad decision and … justice dictates that he be given the opportunity to be able to make amends for his crime and prove to the court that he is not a felon, but a contributing member of society."

Of course, Mr. Nerli's hope that Adam would not be convicted of a felony failed to materialize, but his sentiment is relevant just the same. Adam is a man who deserves a chance to prove to the Court that he is a credit to society who can be trusted to honor the law.

People who have known Adam and his connection with the real estate activities are as complimentary as those who know him through commercial fishing. Tom Woodhouse, owner of Creekside Properties in Willets, states that "Adam does not cut corners and always gives fair

value at his work and has a strong, positive reputation in Mendocino County." Mr. Woodhouse, who has owned his real estate business for 45 years, states that he has "nothing but the deepest respect for Adam Lawrence. He has always worked hard to earn a living and always paid his bills. He is known for doing high quality work with all projects being completed and developed many satisfied customers."

From the letters gathered in Exhibit A, only a few of which have been quoted here, it is clear that Adam Lawrence is an outstanding person, a devoted family man and an ethical business person. In its sentencing memorandum filed as this memorandum was being prepared, the government has quoted passages from Adam's unfortunate and uncharacteristic comments to undercover officers who were seeking evidence against him in the guise of wanting to hunt wild game in Africa. In these excerpts, Adam appears boastful in an apparent effort to impress his guests. He is very embarrassed about these tapes and apologizes for them. They do not reflect the kind of person he is. That person is reflected in the many letters attesting to his character and integrity.

### THE APPROPRIATE SENTENCE

.

As we said at the outset of this memorandum, we believe that the plea agreement and the presentence report reflect the proper approach to this situation by recommending a sentence of probation with appropriate conditions. The government concurs in this recommendation, pointing out that the recommended sentence is sufficient but not more severe than necessary to satisfy the essential goals of sentencing under 18 U.S.C. §3553(a). We respectfully present Mr. Lawrence's letter to probation as a strong indicator of his real remorse and acceptance of responsibility. We agree that Mr. Lawrence should pay an appropriate fine as recommended by

---

5

the probation office and the government. It is also fitting that this fine be directed to the Service where it can be put toward positive environmental goals.

The matter of restitution, raised by the government though not recommended by probation, is another matter and is a bit more complicated. Mr. Lawrence has agreed to pay any restitution that may be found appropriate as directed by the Court, but the government of South Africa has not made a claim for restitution against Mr. Lawrence. While Mr. Lawrence by his false statements about where the Leopard was shot violated the CITES treaty to which South Africa, Mozambique and the United States are signatories, it is more difficult to find that he committed a discrete offense against South Africa by killing the animal that had been preying on livestock on private land. The prosecution emphasizes the estimates of conservation groups and others of a steep decline of the leopard population in South Africa, suggesting that activities like those of Mr. Lawrence play a part in that decrease. However, the situation is a bit more nuanced, according to available information. The ban on hunting leopards announced in 2016 was not meant to be permanent, but was thought necessary to allow the South African authorities to assess the leopard population to determine future quotas.

The documents in Exhibit C address this subject and demonstrate that while South African authorities, like conservationists everywhere, want to preserve the great cats from extinction, that government has also manifested support for properly limited quota hunting as a source of needed revenue. Exhibit C includes an August 6, 2015 bulletin from the South African department of environmental affairs, expressing disappointment on Delta Airlines' embargo on the transportation of hunting trophies in Africa. As that bulletin points out, "South Africa's hunting sector is valued at about R 6.2 billion a year and is a major source of South Africa's socio-economic activity, contributing towards job creation, community development

*Defendant's Sentencing Memo,* Case No. 18-00014 HSG

and social upliftment." In the course of this bulletin, the minister of environmental affairs, Mrs. Edna Molewa, "welcomed  the lifting of an embargo by the cargo division of South Africa's national carrier, South African Airways ("SAA"), on the transport of legally acquired hunting trophies" of various African species.

The decision by the department of environmental affairs ("DEA") to suspend quotas for hunting leopards in 2016, extended to 2017, was not based on a conviction that the situation of the leopard population in the county was dire. Rather, this was temporary in nature, based on uncertainty about the numbers of leopards and was not regarded as a necessarily permanent ban. The suspension of quotas reflected a belief that more information was required to guide future quotas. As the January 16, 2017 DEA bulletin stated, the CITES review process to determine the reality of the leopard population" will continue in 2017 to assure that an appropriate quota is allocated for the South African leopard population."

Additionally, It appears generally agreed that there are many leopards on private land and there is no doubt that these pose a grave threat to livestock and to the cattle industry, with severe economic consequences. The letter of Mr. Rudolph Brits, included in Exhibit A, deals very personally with this. Mr. Brits sets forth that he is a cattle farmer and he formerly resided on a certain identified farm before his retirement. Over the years, according to Mr. Brits, "I have lost countless calves to leopard. I always had a damage/problem animal permit from nature conservation to kill leopard that caught my cattle and I have killed quite a few." Mr. Brits continues:

> "Chris Van Den Bergh is a professional hunter and had hunting rights on my land. I have asked him on more than one occasion to come and help me with the problem leopards. It was one an occasion like this where Mr. Lawrence shot the big leopard. When they came in that morning I told them to be on the lookout because I just lost

*Defendant's Sentencing Memo,* Case No. 18-00014 HSG

another calf the night before. The financial loss over the years has been quite substantial. In the past the leopard population had been monitored closely and the farmers got help from nature conservation when controlling the problem. But these days there are no controls and the leopards have flourished …

That is the main reason for the deaths of a large number of leopard at the hands of cattle and game farmers. Leopards are shot, poisoned or caught and then killed but nobody admit to it. But this has become the norm. Farmers just cannot afford the losses caused by the wild animals."

While Mr. Brits can no longer locate his permit due to having moved to a smaller residence, he affirms that he had one and that it was under its authority that Mr. van den Bergh and his client, Adam Lawrence shot a problem leopard on his land.

All this is not to deny Mr. Lawrence's acceptance of responsibility for the Lacey Act violation to which he has pleaded guilty. Nor should there be any doubt that Mr. Lawrence will pay any fine or restitution ordered by the Court. Respectfully, however, we believe that the government's effort to require restitution to South Africa, which South Africa has not requested, on the ground that Mr. Lawrence's conduct deeply offended the laws and policies of that country, is unpersuasive. The case cited by the government, *United States v. Bengis*, 631 F. 3d 33 (2d Cir. 2011), where restitution was awarded, is very different from the case of Mr. Lawrence. Over a period of four years, the Bengis defendants, engaged in "an elaborate scheme to harvest large quantities of south coast and west coast rock lobsters from South African waters for export to the United States in violation of both South African and U.S. law." Over the years, the defendants, through their parent company, harvested rock lobsters in amounts far exceeding the authorized quotas and exported them to the Unites States for their own financial enrichment. South Africa brought charges against the defendants' parent company for violating its Marine Living Resources Act, and declined to prosecute the

individuals only because it determined they were beyond the reach of South African authorities. Large amounts of money were involved in the case and South Africa clearly wanted restitution, though the means of calculating it were in doubt.

Mr. Lawrence's situation is very different. Mr. Lawrence shot two problem leopards that were plaguing livestock on private lands. There is no reason to doubt Mr. Brit's statement that he had a permit for the leopard preying on his farm, nor is there any basis upon which to conclude that, whatever one thinks of shooting big game under any circumstances, Mr. Lawrence acted unlawfully in shooting marauding leopards on private lands. He did, however, clearly offend the laws of South Africa, Mozambique and the United States as signatories to the CITES treaty by misrepresenting where the leopard was shot, in his misguided effort to export its remains to the United States. But that is what his criminal conviction here is all about and that is why he should and will pay a fine to an account designated by the Fish and Wildlife Service for conservationist purposes. He will pay without complaint whatever monetary sanction the Court finds appropriate, but it may not make a great deal of sense to require him to write a check to "South Africa" without request and lacking any clear rational basis.

## CONCLUSION

Adam Lawrence is an outstanding person, a credit to his family and the community who made a serious mistake for which he has paid and will continue to pay serious consequences. His days as a hunter and an owner of antique firearms are over, and his vocation as a real estate agent is jeopardized by his felony conviction. He has been humbled and devastated by this experience because he has obviously been a law abiding person all of his life. He is deeply and seriously remorseful. We respectfully urge the court to follow the

_____
9

recommendation of the parties and the probation office and sentence Mr. Adam Lawrence to probation under appropriate conditions.

//

Dated:                                         Respectfully submitted,

                                               _/s/ William L. Osterhoudt_
                                               William L. Osterhoudt

*Defendant's Sentencing Memo,* Case No. 18-00014 HSG